# United States Court of Federal Claims

**No: 07-17 C**
(Filed under Seal: October 4, 2007)
(Reissued: October 12, 2007)[1]

---

**MCKING CONSULTING CORPORATION,**

***Plaintiff*,**

**v.**

**THE UNITED STATES OF AMERICA,**

***Defendant*.**

**Procurement Integrity Act 41 U.S.C. § 423; Competition in Contracting Act, 41 U.S.C. § 253; Small Business Set-Aside; Bid Protest; Federal Acquisition Regulation Part 19.**

---

*Jessica C. Abrahams*, McKenna, Long & Aldridge LLP, for the plaintiff.

*Steven Mager*, Commercial Litigation Branch, United States Department of Justice; Michael I. Goulding, Office of the General Counsel, U.S. Department of Health & Human Services, of Counsel, for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

This is a pre-award bid protest. Plaintiff McKing Consulting Corporation ("McKing") challenges the December 22, 2006 Human Resources and Services Administration ("HRSA") issuance of Request for Proposals No. TA SERVICES MCHB-DLC (the "Solicitation"), and seeks to permanently enjoin the performance of the contract. HRSA is part of the federal government's Department of Health & Human Services ("DHHS"). McKing is an incumbent contractor with HRSA, currently providing oral health consulting services. The Solicitation seeks bidders for oral health technical assistance support services—essentially the same work as McKing's existing contract. McKing secured its existing contract through a 2004 small business set-aside solicitation. Their existing contract's expiration prompted the challenged Solicitation. McKing asserts the

---

[1] This opinion originally was issued under seal on October 4, 2007. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication. Accordingly, the opinion is herein reissued for publication, unsealed, with only minor alterations.

Solicitation should not be a small business set-aside, and brings three claims—violation of the Competition in Contracts Act, 41 U.S.C. § 253 *et. seq.*, ("CICA") and Federal Acquisition Regulation ("FAR"), arbitrary and capricious conduct by HRSA with regard to the procurement, and violation of the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423.

Both parties have moved for judgment on the record. Rule 52.1(b), Rules of the Court of Federal Claims ("RCFC"). Pl.'s Mot. for Jdgmt on the Rec; Def.'s Cross-Mot. for Jdgmt on the Rec. Plaintiff also moves for permanent injunctive relief. RCFC 65. The Court held a hearing to address the motions on March 29, 2007. Because the government did not act contrary to law when soliciting the procurement as a small business set-aside, the Court denies plaintiff's request for injunctive relief and for its motion on the record. The Court grants defendant's motion for judgment on the record.

## I. FACTUAL BACKGROUND[2]

This pre-award bid protest arises out of the Solicitation issued by HRSA for technical assistance support services—the same work McKing is currently performing for HRSA pursuant to a 2004 contract award. Pl. Amend. Cmpl. Specifically, the Solicitation called for bidders to provide dental consultants to perform the following work during the course of the contract—develop plans and policies for oral health conferences, develop technical materials for oral health conferences, manage conference logistics and communications, and staff and manage federal grant application review meetings. AR 10-14.

McKing's contract was scheduled to expire on September 28, 2006, prompting the issuance of the Solicitation. Pl. Amend. Cmpl. McKing continues to provide dental health consulting services to HRSA pursuant to their expired contract, pending the outcome of this litigation. At the time of the old contract award, McKing was a certified small business under the Small Business Administration's ("SBA") 8(a) Program.[3] The original contract was awarded pursuant to a 100% small business set-aside. *Id*. It is undisputed that McKing was no longer eligible to bid as a small business when the Solicitation was issued. Pl. Amend. Cmpl.

As part of HRSA's acquisition planning for fiscal year 2006, HRSA identified its procurement needs through the creation of a procurement plan. AR 608. HRSA's procurement plan was a culmination of discussions with those responsible for various aspects of the procurement, and

---

[2] Unless otherwise noted, the relevant facts of this case derive from the administrative record.

[3] The goal of the SBA 8(a) Program is to "assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1 (2007). "Generally, a concern meets the basic requirements for admission to the 8(a) program if it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the Untied States, and which demonstrates potential for success." 13 C.F.R. § 124.101 (2007).

served as the agency's tool for complying with FAR Part 7.[4] AR 2625-26. Specifically, HRSA evaluated its existing contracts, and forecasted what contracts needed to be reprocured in the future. *Id*. HRSA also transmitted its fiscal year 2006 procurement needs to the Office of Small and Disadvantaged Business Utilization ("OSDBU") in a report entitled "Forecast of HHS' Contracting Opportunities for FY 2006." AR 608-18; 2613-19. The report, a forecast of business opportunities made for informational and marketing purposes, was published on September 28, 2005, and posted on the OSDBU website for the entire fiscal year. AR 608, 618. The procurement that is the subject of the Solicitation that McKing now challenges is listed in the Forecast as a small business set-aside that HRSA planned to solicit in the forth quarter of FY 2006. AR 614. During their evaluation of their existing contracts, HRSA recognized the need to solicit a follow-up contract for the expiring McKing oral health services consulting contract. AR 608, 614. HRSA attempted to solicit bidders for the follow-up contract three times, the final attempt being the Solicitation now subject to this lawsuit.

The first reprocurement attempt was through a Strategic Sourcing Initiative ("SSI") implemented by the Office of the Secretary for Administration and Management ("OSAM") of the Department of Health and Human Services ("DHHS"). Pl. Amend. Cmpl. The purpose of the SSI was to reduce operational costs by using blanket purchase agreements ("BPA") with vendors to receive discounts. *Id*. Since the government is a high-volume consumer of good and services, the SSI was implemented to lower prices paid by government agencies by using the purchasing leverage mass quantities provide. *Id*. The initial solicitation attempt looked to take advantage of a General Services Administration ("GSA") schedule program. *Id*. Commonly referred to as the "Sears catalog of government contracts," the GSA's schedules provide the convenience of contracts that have already been vetted for price reasonableness, so an agency need only focus on the responsiveness of a potential contractor. Transcript of Oral Argument at 21. A winning bid on the first reprocurement attempt was submitted by Professional and Scientific Associates, Inc. ("PSA"), pursuant to an events management BPA schedule. Pl. Amend. Cmpl.

McKing protested the first solicitation attempt on August 29, 2006, and filed a protest with the Government Accounting Office ("GAO") on October 10, 2006, contending the contract should not have been drawn from an events management schedule because the work solicited was not technically "events management." Transcript of Oral Argument at 25-27. After the GAO protest was dismissed as untimely, McKing filed a protest in this Court on November 13, 2006. AR 443. Upon review of the merits, and without an admission of any wrongdoing, HRSA took voluntary remedial action, terminating the BPA solicitation attempt on November 27, 2006, "for the convenience of the government." AR 570. The government then moved to dismiss the claim in this court, and because the termination of the contract made the case moot, this court dismissed McKing's protest on December 1, 2006. AR 572-573.

---

[4] FAR Part 7 provides policy for acquisition planning and market research for all federal government acquisitions. The stated purpose of acquisition planning is "to ensure that the Government meets its needs in the most effective, economical, and timely manner." 48 C.F.R. 7.102(b).

Thereafter, the contracting officer, Alexandra Garcia, along with contract specialist Diane Coger and project officer for procurement Mark Nehring, determined that in order to utilize funds from the cancelled BPA contract, HRSA had to award a replacement contract within 100 days of the termination of the BPA contract.[5] AR 621. However, before issuing the second solicitation attempt, Ms. Garcia conducted research on GSA's schedule database, and identified eight GSA schedules that could potentially be used to procure the required services. *Id*. Ms. Garcia then determined that the Mission Oriented Business Integrated Services[6] ("MOBIS") schedule was appropriate because its contracts consisted of consulting services providers. *Id*. Garcia also noted that McKing, the incumbent contract holder, was identified on the GSA schedule database as a MOBIS schedule contract holder and as a small business. AR 621, 633.

On December 1, 2006, a draft statement of work was sent to the GSA Acquisition Management Center for review. AR 621, 635. Then, on December 7, 2006, Ms. Patricia Waddell, a GSA contracting officer for the MOBIS schedule, confirmed in a phone conversation with Ms. Coger that the MOBIS schedule holders could provide the services sought by HRSA, as long as the labor categories requested were offered by the vendors. AR 621, 623. Thus, on December 8, 2006, the second solicitation attempt was posted online on "e-Buy," a government contract online listing site accessible to GSA schedule contract holders. AR 649-679. HRSA contends that the MOBIS schedule was chosen after the contracting officer's research identified 1053 small business schedule contract holders. AR 621. All the same, within a few hours of the second solicitation attempt's posting, HRSA received 55 responses from potential bidders stating they could not adequately

[5] The GAO has specified that when a contracting officer terminates a contract for the convenience of the government, the funds originally set aside for that contract remain available for a replacement contract awarded in a subsequent fiscal year, provided that certain requirements are met. *Navy Replacement Contract*, B-238548, 70 Comp. Gen. 230, 1991 U.S. Comp. Gen. LEXIS 171 (Feb. 5, 1991). One requirement specifies that a replacement contract must be executed without "undue delay," *i.e.*, within 100 days of contract termination. *Id*.

[6] Although not clearly defined in the record or by the parties, the Court has discerned that the MOBIS program is basically a schedule of contractors that the GSA has collected and vetted for price and skill responsiveness, as well as for other qualifying factors. Agencies use GSA schedules like MOBIS to solicit contractors, in order to advantage of GSA's advanced screening of potential contractors. On their website, the GSA states, "[t]he MOBIS program offers a full range of management and consulting services that can improve a federal agency's performance and their endeavor in meeting mission goals. MOBIS contractors possess the necessary expertise to facilitate how the federal government responds to a continuous stream of new mandates and evolutionary influences including the President's Management Agenda; Government Performance and Results Act; Federal Acquisition Streamlining Act; OMB Circular A-76; Federal Activities Inventory Reform Act; government reinvention initiatives such as benchmarking and streamlining." *See* http://www.gsa.gov/mobis.

respond to or bid on the project for various reasons, including insufficient time to respond, or not offering the services required. *Id*. Based on these responses, Ms. Garcia decided to conduct additional market research, and after doing so, determined that there was no advantage to using the MOBIS schedule and that it would be more efficient to conduct a competition pursuant to FAR Part 15.[7] AR 622. Ms. Garcia also determined through market research that while a number of small businesses chose not to offer the necessary labor categories under their GSA schedule contracts, they did offer the required services, and therefore would be able to respond to a solicitation issued under a FAR Part 15 solicitation. AR 621. Thus, the MOBIS solicitation attempt was cancelled on the same day of its issuance, December 8, 2006. AR 749.

Consequently, pre-solicitation notice for the third solicitation attempt, the Solicitation subject to this challenge, was posted online on December 8, 2006. AR 958-960. Soon thereafter, four small businesses expressed interest in the Solicitation—Epipeline Inc. ("Epipeline") on December 12, 2006, Alliance for Quality Education Inc. ("AQE") on December 14, 2006, Rivera Sierra & Co. ("Rivera") on December 17, 2006, and Capital Consulting Corporation ("CCC") on January 9, 2007. On January 22, 2007, HRSA received proposals from three small businesses—AQE, Rivera and CCC. McKing is a subcontractor on CCC's bid. AR 1145.

On December 14, 2006, after pre-solicitation notice for the third attempt was posted online, but before the Solicitation itself was posted, McKing notified contract specialist Ms. Coger that because McKing no longer qualified as a small business, McKing believed that it was inappropriate to restrict the procurement to small businesses as doing so would prohibit McKing's participation. AR 979. Nevertheless, given the procurement history, HRSA determined the solicitation should remain a small-business set aside and on December 22, 2006, the contracting officer posted the Solicitation online. AR 751. In response to formal posting of the Solicitation, on December 29, 2006, McKing's counsel sent a letter to Ms. Coger reiterating McKing's objection. In the letter, McKing's counsel again challenged HRSA's decision to continue to set-aside the procurement for small businesses, because McKing no longer qualified as a small business and would be unable to compete for the contract. AR 1067-1068. On January 12, 2007, Ms. Garcia sent a letter to McKing stating that HRSA was treating McKing's letters of December 14, 2006 and December 29, 2006 as an agency-level protest, subject to the requirements of FAR § 33.103.[8] AR 1092. However, because the letters lacked a detailed statement of the legal and factual grounds for a protest, Ms. Garcia dismissed the protest. AR 1093.

---

[7] FAR Part 15 prescribes policies and procedures for competitive and noncompetitive negotiated acquisitions. 48 C.F.R. § 15.

[8] FAR § 33.103 provides the rules an interested party must follow if it seeks to protest an Agency-level procurement. Among other things, protests must include a "detailed statement of the legal and factual grounds for the protest, [and] a description of the resulting prejudice to the protestor. 48 C.F.R. § 33.103(d)(2)(iii).

On January 20, 2007, in light of McKing's protest of the small business set-aside, Garcia e-mailed Malda Brown, the SBA's procurement center representative seeking guidance on the set-aside. Ms. Brown responded that the "SBA recommends the task remain in the small business arena," and further, warned that "the SBA will file a Form 70 to stop this action if you proceed with a full-open requirement." AR 1100. Based on this interaction and the history of the procurement, the Solicitation was maintained as a small business set-aside. AR 751.

Plaintiff also asserts a Procurement Integrity Act[9] ("PIA") claim, 41 U.S.C. § 423, based on the following facts: In February 2005, a list of dental consultants involved with McKing's original contract was posted on a website hosted by Georgetown University.[10] AR 2454-62. The dental consultants were fully aware of this posting, and assisted in compiling the information for the website. AR 2463-2529. It is uncontroverted that the consultant list stayed online and was available to the public for almost two years. On December 14, 2006, McKing delivered a letter to HRSA claiming a proprietary right to that consultant list. AR 979. On December 29, 2006, counsel for McKing sent a letter to Ms. Coger reiterating McKing's assertion that it considered the identity and contact information of its dental consultants to be proprietary and subject to protection by the Trade Secrets Act, 18 U.S.C. §1905. AR 1067. On January 16, 2007, Ms. Garcia responded to McKing, stating that HRSA believed there was no basis for McKing's assertion that the dental consultant information was proprietary because: 1) the information was available online for over 18 months; 2) neither McKing nor McKing's employees or consultants created the list while engaged by McKing; 3) McKing did not submit its list of dental consultants with a legend indicating it was proprietary to McKing; 4) McKing did nothing to notify HRSA that McKing considered the information proprietary before it was posted on the website; and 5) even if McKing had created the consultant list, per the terms of their contract with HRSA, any such list would be deemed property of the government. AR 2588-89. Despite these articulated reasons, Georgetown removed the consultant information from its website on January 18, 2007. AR 2590. HRSA notified McKing that HRSA had the information removed from the website and requested the factual and legal bases for McKing's assertion that the information was proprietary to McKing. AR 2591.

On January 30, 2007, after not having received the requested bases for their allegations from McKing, Ms. Garcia sent a letter to McKing informing them of her findings. AR 2591-92. Ms. Garcia concluded in her letter that: 1) the dental consultants listed on the Georgetown website had voluntarily provided their names, contact information and other biographical information to

---

[9] The PIA provides restrictions on disclosing and obtaining contractor bid, proposal, or source selection information. Generally, government officials are prohibited from disclosing bid and proposal information before award of a procurement contract, and members of the public are prohibited from trying to obtain such information. 41 U.S.C. § 423.

[10] http://www.mchoralhealth.org/HeadStart/RegionalConsMap.html#rossetti.

Georgetown; 2) the dental consultants were fully aware their information would be made public by posting to the website; and 3) there was no correspondence from McKing to Georgetown or HRSA indicating that the information posted on the website was proprietary to McKing prior to the information being posted. *Id*. Based on this, Ms. Garcia concluded McKing's proprietary claim to the information posted on the website was invalid. *Id*.

On February 9, 2007, McKing's counsel responded to Ms. Garcia's January 30, 2007 letter. AR 2593-95. In the letter, McKing's counsel asserted: 1) it is immaterial whether the consultants voluntarily provided their information to Georgetown; 2) HRSA or Georgetown should have sought McKing's permission from McKing before posting the consultant information on the website because the consultants were paid by McKing; 3) McKing was unaware of the posting until early January 2007; 4) McKing would not have granted permission to publish the consultants' information; and 5) McKing has always considered its consultant information to be proprietary and trade secret in nature. *Id*.

In addition to the posting of dental consultant information on the internet, McKing alleges improper contact between HRSA and Rivera. Pl. Amend. Cmpl. On December 17, 2006, Jose Rivera, President of Rivera, e-mailed Contract Officer Alexandra Garcia, Contract Specialist Diane Coger, and HRSA branch chief Frank Murphy. AR 909. The e-mail contained questions about the upcoming Solicitation, and was apparently drafted in response to the December 8, 2006 pre-solicitation notice. *Id*. On December 19, 2006, Coger called Rivera to explain "how this is coming out." AR 1083. However, after the phone call, Rivera continued to submit e-mail questions to HRSA, specifically on December 19, 2006 and January 5, 2007. AR 907, AR 1081. On January 12, 2007, HRSA posted an amendment to the Solicitation, "to answer questions posed by vendors." AR 954. The amendment contained questions posed by Mr. Rivera in his e-mails of December 19, 2006 and January 5, 2007, as well as questions from other vendors. *Id*. McKing points to the e-mails from Rivera as evidence of improper communications with the government.

## II. DISCUSSION

### A. Jurisdiction, Standing & Standard of Review

The Tucker Act, as amended by the Administrative Disputes Resolution Act ("ADRA"), provides the U.S. Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2000). This jurisdiction exists "without regard to whether the suit is instituted before or after the contract is awarded." *Id*. Here, we have a situation where an agency is specifically accused of violating a statute. *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286 (Fed. Cir. 1999) (noting that as long as a statute has a connection to

a procurement proposal, an alleged violation of that statute suffices to supply jurisdiction). Specifically, McKing asserts that HRSA violated CICA by improperly issuing the Solicitation as a small business set-aside, and violated the PIA by improperly assisting Rivera with their bid and publicly disclosing McKing's proprietary information.[11] Pl.'s Mot. for Jdgmt on the Rec. Either alleged statutory violation, be it the CICA or the PIA claim, suffices to supply jurisdiction to this court. Further, because a pre-award bid protest case falls squarely within the definition of 28 U.S.C. § 1491(b)(1), the court has subject matter jurisdiction to review McKing's claims in this case.

An initial threshold burden placed on the plaintiff is the requirement of demonstrating prejudice. As clarified by bid protest jurisprudence binding on this court, prejudice is a necessary element of standing. *Meyers Investigative & Security Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). *See also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 108–09 (2003). In order to prevail in a bid protest, the protestor must show not just a significant error in the procurement process, but also that the error was prejudicial. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). This means that prejudice must be based not on the ultimate merits on the case, but on allegations of error. *See Info. Tech.*, 316 F.3d at 1319. Accordingly, a protester is not required to show that "but for the alleged error, the protester would have been awarded the contract." *Id.* Instead, the prejudice requirement mandates that the protester establish that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.*

Consequently, the Court rejects the government contention that McKing has no standing to assert their PIA claim because the Tucker Act is limited to "actual or prospective bidders or offerors," and McKing could not have been a prospective bidder because the Solicitation was designated a small business set-aside and McKing no longer was a small business. Def.'s Cross-Mot for Jdgmt on the Rec. at 35. But this is nothing more than a post hoc rationalization. What establishes standing under the Circuit's case law is a viable allegation of agency wrong doing, "viability" here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true. *See Meyers Investigative Servs.,* 275 F.3d at 1370; *Impresa*, 238 F.3d at 1332–33; *Overstreet Elec. Co.*, 59 Fed. Cl. at 109. McKing, as explained below in greater detail, is here challenging the lawfulness of the HRSA's choice of the small business model. Given that it was the incumbent contractor, and implicitly able to adequately perform in the future, this allegation of agency illegality fulfills the reasonableness requirement and, therefore, is enough to demonstrate that McKing was prejudiced by the procurement process. Additionally, McKing's PIA allegations (again, these

---

[11] CICA provides the rules for how government agencies should conduct their procurements of property and services. Generally, agencies are required to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of [CICA] and the Federal Acquisition Regulation." 41 U.S.C § 253(a). However, exceptions to this general rule apply and are enumerated in the statute, including the use of small business set-asides in furtherance of other government statutes. 41 U.S.C. §253(b)(2).

allegations are more fully addressed below) buttress their CICA allegations for standing purposes. If HRSA improperly disclosed McKing's proprietary information to other bidders, as McKing alleges, or assisted other bidders with their bidding documents, as is also alleged, such behavior certainly would prejudice McKing. Accordingly, McKing sufficiently demonstrates it was prejudiced by the alleged agency errors. The Court does not have to, as the government asserts, initially adjudicate the legal merits of the protestor's allegation in order find standing. *See Info. Tech.*, 316 F.3d at 1319 (holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits," (emphasis added)).[12]

Turning now to the standard for review for bid protests, it is well-settled that the Court of Federal Claims does not review *de novo* an agency's bid procurement actions; rather, it is limited to a consideration of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 702, 706(2)(A). *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Specifically, the court has discretion to set aside an agency decision only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard applicable here is highly deferential. The standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). "Although [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. This arbitrary and capricious standard acknowledges a 'zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking.'" *JWK Int'l. Corp. v. United States*, 52 Fed. Cl. 650, 654 n 8 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir. 2003). Clearly, then, this court is not empowered to substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Accordingly, the law is that the plaintiff bears the "heavy burden" of proving a lack of rational basis or a violation of the law by a preponderance of the evidence. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001).

**B. McKing's Contentions**

---

[12] The government also contends that McKing's PIA claim is not ripe for review because McKing failed to file a required protest with the agency before filing its complaint with this court. Def.'s Cross-Mot for Jdgmt on the Rec. at 36. To be sure, the PIA requires a party to report a PIA violation to the Agency before filing a protest at the GAO . 41 U.S.C. § 423(g). However, no similar requirement exists for a PIA challenge in this court. In fact, the government, in arguing its point, even admits no such requirement exists. Def.'s Cross-Mot for Jdgmt on the Rec. at 36. It merely suggests that the policy behind the agency level challenge before a GAO should also apply to a challenge before this court. *Id.* Regardless of the merits of their policy argument, the Court is not empowered to make law.

In order to breach the wall of this very difficult burden, McKing advances three arguments in support of its contention that the agency acted improperly by issuing the Solicitation as a small business set-aside. First, McKing alleges HRSA violated the requirements of CICA and FAR Parts 7 and 10[13] when designating the Solicitation as a small business set-aside and jettisoning the small business model it had successfully used in the past. Second, McKing asserts HRSA acted arbitrarily and capriciously when it issued the Solicitation. Finally, McKing alleges HRSA violated the PIA by intentionally disclosing McKing's proprietary information to other bidders and by improperly communicating with and assisting Rivera with their proposal. Not surprisingly, the government contends that it did not violate any statutes or regulations when issuing the Solicitation.

Turning to McKing's first claim, McKing's theory is predicated upon the contention that HRSA failed to perform mandatory acquisition planning and market research, and that this failure was what directly violated the requirements of CICA and the FAR's. Pl. Amend. Cmpl. McKing asserts that had HRSA conducted adequate research and planning, HRSA would have realized that the Solicitation should not have been issued as a small business set-aside because there were no qualified small business concerns able to perform the services required by the Solicitation. Pl.'s Memo in Support of its Mot for Jdgmt. on the Rec.

McKing's next contention, that HRSA acted arbitrarily and capriciously, is demonstrated, McKing alleges, by HRSA's multiple solicitation attempt which show that HRSA intentionally and impermissibly excluded McKing from the Solicitation. Pl.'s Memo in Support of its Mot for Jdgmt on the Rec. Indeed, McKing explains that the purpose behind this illicit intention was to exclude McKing from the bidding. *Id*. For support, McKing points to the two failed solicitation attempts, as well as the currently challenged Solicitation, and states that their only unifying quality was the fact that they were all small business set-asides, a model that to McKing was no longer viable. *Id*. Accordingly, to McKing, the only logical conclusion that can be drawn is that HRSA deliberately designed the attempts to award a contract to an offeror other than McKing. *Id*. Such intentional behavior, McKing alleges, had no rational basis, and therefore was arbitrary and capricious. *Id*.

McKing's third and last argument, the PIA claim, breaks down into two alleged illegalities—first, McKing contends that HRSA intentionally and improperly disclosed a proprietary list of dental consultants to other prospective bidders in order to ensure that HRSA would receive enough responsive small business concern bids, and second, McKing maintains that HRSA improperly communicated with and assisted Rivera to make certain that Rivera's bid would be responsive. Pl. Amend. Cmpl. McKing's proprietary information contention is based on an inference that the list of dental consultants posted on the Georgetown University website exactly mirrored

---

[13] FAR Part 10 "prescribes policies and procedures for conducting market research to arrive at the most suitable approach to acquiring, distributing, and supporting supplies and services." 48 C.F.R. § 10. FAR Part 10 implements the requirements of CICA. (CICA and FAR Part 7 have been briefly discussed earlier in this opinion.)

McKing's own roster of dental consultants and therefore was illicitly purloined. McKing's improper communication is based on the following allegations: HRSA sought out Rivera, impermissibly provided Rivera with the names of qualified subcontractors, the names and contact information for McKing's dental consultants, as well as pay rates for McKing's consultants, *id*., and that absent the alleged improper assistance, Rivera would not have been able to bid on the Solicitation, and, finally, that the Solicitation would not have been allowed as a small business set-aside because of the lack of small business bidders, *id*.[14]

**C. HRSA did not act arbitrarily, capriciously, or otherwise contrary to law**

In essence, McKing's three primary contentions, just delineated, overlap because they are based on either the same operative facts or on events that stem from these facts. Thus, McKing's CICA allegation—the improper designation of the Solicitation as a small business set-aside allegedly in violation of 41 U.S.C. § 253 *et seq.*, and FAR Parts 7 and 10—is directly related to the arbitrary and capricious contention that HRSA purposely chose the small business model as a way to exclude McKing from the bidding on the contract. Further, the PIA claim can be reduced to a variant bad faith allegation—to wit, that this agency unlawfully disclosed McKing's proprietary information and aided Rivera in the effort to assist Rivera in creating a winning bid. Accordingly, the task for this Court is to search the record for evidence of whether the agency followed proper procedures and, if not, whether this was tantamount to an anti-McKing animus. *See Impresa*, 238 F.3d at 1332 (holding when a challenge is brought on the allegation of a violation of regulation or statute, the disappointed bidder must show a "clear and prejudicial violation of applicable statutes or regulations," (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994))).

---

[14] At this point, it should be noted that in their amended complaint, McKing apparently alleges a violation of the Trade Secrets Act ("TSA"), 18 U.S.C. § 1905, based on the same facts they allege in their PIA claim. Pl. Amend. Cmpl. ¶ 46. Indeed, the allegation is in the section of the complaint in which the PIA violation is pleaded. *Id.* The issue is whether this is a separate and discrete claim. In all their subsequent papers filed with the court, McKing did not substantively advance or even discuss their TSA allegation. Moreover, McKing's counsel disavowed even making a specific TSA claim, instead asserting that the TSA argument was proffered only as further evidence of governmental wrongdoing. *Id.* McKing's counsel, when discussing the TSA claim, even went so far as to accuse government's counsel of deliberately attempting to confound the PIA issue by discussing the TSA claim. Pl.'s Reply to Def.'s Cross-Mot for Jdgmt on the Rec. at 3. Clearly, not knowing whether the Trade Secret Act claim was a separate one, the government undoubtedly acted prudently by devoting time and effort disputing the TSA allegations. Accordingly, it is clear that any obfuscation of the PIA issue that might have occurred was obviously the result of McKing's counsel raising and subsequently abandoning the TSA allegation, and not by any misdirection by the government.

Did HRSA, then, violate applicable procedures? For if it did not, then McKing's entire edifice falls. Whether plaintiff's allegation of governmental animus against McKing rises to the level of arbitrary and capricious conduct depends on whether HRSA followed applicable law and proper procedure, particularly in choosing the small business set-aside model pursuant to the dictates of CICA, 41 U.S.C. § 253 *et seq*, and the FAR. Simply put, McKing fails to show that HRSA violated applicable statutes and regulations when issuing the Solicitation.

HRSA issued the Solicitation as a small business set-aside, after evaluating the history of the procurement and consultation with the SBA. The SBA was created in 1953 as an independent agency of the federal government to aid, counsel, assist and protect the interests of small business concerns, to preserve free competitive enterprise and to maintain and strengthen the overall economy of our nation.[15] The charter of the SBA stipulated that the SBA would ensure small businesses a "fair proportion" of government contracts.[16] SBA programs now include financial and federal contract procurement assistance, management assistance, and specialized outreach to women, minorities and armed forces veterans.[17] Because of the SBA, it is the policy of the United States that small businesses, disadvantaged small businesses, women-owned small businesses, and veteran-owned small businesses have the maximum practicable opportunity to participate in the performance of contracts awarded by any federal agency.[18] The federal government's procurement policy, enumerated in the FAR, directly effectuates the general policy of the SBA. While McKing focuses on CICA and FAR parts 7 and 10, the standard for determining whether a procurement is properly set aside for a small business is instead covered in FAR part 19.

Specifically, FAR part 19 provides in pertinent part that:

> The contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a *reasonable expectation* that (1) offers will be obtained from at least two responsible small business concerns (but see paragraph (c) of this subsection); and (2) award will be made at fair market prices. Total small business set-asides shall not be made unless such a reasonable expectation exists . . . . Although past acquisition history of an item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists . . . .

---

[15] http://www.sba.gov/aboutsba/index.html

[16] http://www.sba.gov/aboutsba/history/index.html

[17] *Id*.

[18] *The Government's Role in Aiding Small Business Federal Procurement Subcontracting Programs in the United States*, Office of Advocacy, U.S. Small Business Administration, http://www.sba.gov/advo/research/rs281tot.pdf.

48 C.F.R. §19.502-2(b) (emphasis added). Thus, when evaluating HRSA's set-aside decision, the important question to consider is did HRSA have a "reasonable expectation"—as required by FAR Part 19—that at least two qualified small business bidders existed? The record clearly demonstrates that HRSA did have such a reasonable expectation. To be sure, HRSA's reasonable expectation was based on a procurement history of successful procurement under a small business set-aside model, as well as sufficient acquisition planning and market research. AR 751. Accordingly, the only rational conclusion that can be drawn is that McKing's argument that HRSA violated statutory mandates fails because HRSA followed the relevant law that governs small business set asides in FAR part 19.

Turning first to McKing's main argument in challenging the small business set-aside—that HRSA could not have reasonably expected at least two responsive bidders because of the history of the procurement and its related contracts—the Court finds that the evidence in the record is to the contrary. Given the procurement history, both that of the predecessor contract and of the Solicitation in question here, the contracting officer certainly could have reasonably believed it would receive at least two responsive bids from small business concerns when issuing the Solicitation. Indeed, as pointed out, McKing's predecessor contract was solicited as a small business set-aside, and successfully bid on and was awarded as a small business set-aside. AR 750, 752. Based on the procurement history of the predecessor contract, HRSA could have reasonably expected to received enough responsive bids to the Solicitation to keep it as a small business set-aside.

Specifically, the actions of HRSA surrounding the immediate history of the challenged Solicitation lead inexorably to the conclusion that the agency could have reasonably believed that two qualified bidders existed and would respond to an offer. HRSA attempted to procure the follow-up contract to McKing's expiring contract two times prior to the Solicitation. AR 608, 614, 621. Both of these prior solicitation attempts were issued as small business set-asides, and HRSA received responsive bids on the first attempt, and had a large enough universe of potential bidders to reasonably expect at least two responsive bidders on the second attempt. *Id*. Despite HRSA's ultimately withdrawing both attempts for different reasons, these two prior solicitation attempts provide further evidence that indicate HRSA could have reasonably expected at least two responsive bidders if it what is more the Solicitation as a small business set-aside.

After conducting sufficient market research and acquisition planning (the significance of which is discussed immediately below), HRSA issued a pre-solicitation notice of a third solicitation attempt on December 8, 2006. AR 958-960. Within a few weeks of issuing the pre-solicitation notice, HRSA received at least four expressions of interest in the Solicitation, including one expression of interest from CCC, a company for which McKing was a subcontractor. AR 899-906, 909-913, 1145. This history further confirms the reasonableness of HRSA's expectation that it would receive at least two responsive bids. If four companies expressed interest in the project before the actual Solicitation was even issued, the contracting officer certainly could have reasonably expected

that at least two of those companies would submit responsive bids. Given the procurement history of the predecessor contract, as well as the immediate procurement history of both the withdrawn procurement attempts and the actual Solicitation at issue, the Court finds that the decision to issue the Solicitation as a small business set-aside was certainly reasonable.

McKing's next argument supporting alleged agency illegality—HRSA's alleged failure to conduct sufficient market research—is equally without merit. The record clearly demonstrates that contrary to McKing's contention, HRSA did indeed perform adequate market research and acquisition planning, both before and during the procurement process. The follow-up procurement to McKing's then-existing contract was planned as a small business set-aside as early as September 2005. AR 608-617. And in anticipation of the expiration of McKing's existing contract, HRSA conducted advanced acquisition planning for fiscal year 2006, and identified its procurement needs through the creation of a procurement plan. AR 608. HRSA evaluated McKing's existing contract, recognized the need to solicit a follow-up contract, and researched various procurement vehicles which it could use to secure a contract for the procurement need. AR 608, 614.

For the first reprocurement attempt, the contracting officer chose the BPA vehicle under the GSA's schedule program to issue an initial solicitation for the follow-up contract. And after withdrawing that first procurement attempt, the contracting officer conducted additional research to determine the best procurement method available, and selected a procurement vehicle (the MOBIS schedule) that provided as many as 1053 potential bidders for the second solicitation attempt. AR 621. While it is true that further research revealed to the contracting officer that many of those 1053 would not be able to bid on the project, it is certainly reasonable to believe that the contracting officer, given over 1000 prospective bidders, reasonably could have expected at least two responsive bidders.

Furthermore, even after HRSA abandoned the second reprocurement attempt and decided to issue the Solicitation that is subject to this challenge, the contracting officer performed even more acquisition planning and research. AR 751. And before issuing the Solicitation, HRSA communicated with both the OSDBU and the SBA, both of whom were aware of and supported the procurement attempts being issued as a small business set-aside. AR 608-18, 1100, 2613-19. Given all this, as documented by the contracting officer throughout the "reprocurement" process, the Court cannot say that HRSA failed its duty to perform sufficient acquisition planning and market research. AR 608, 614, 621, 751.

After failing to demonstrate that HRSA could not have reasonably expected at least two responsive small business bidders, nor conducted sufficient market research and acquisition planning, as a sort of "backup" argument, McKing argues that HRSA could not have reasonably believed it would receive at least two responsive small business concern offers because Rivera and AQE did not in fact present valid offers. Pl. Mot. for Jdgmt on the Admin. Rec. With regard to Rivera's bid, McKing focuses on the fact that Rivera's list of consultants was identical to McKing's own list of incumbent contractors—presenting a kind of a "fruit of a poisonous tree" argument. McKing

contends that Rivera obviously was not qualified because it would not have had the required consultant information without improperly obtaining McKing's list of consultants with the help HRSA.[19] With regard to AQE's bid, McKing claims AQE did not provide the mandatory resume information for proposed consultants as required by the Solicitation, thereby making their bid unqualified. All the same, McKing's focus here on the substance of Rivera's and AQE's bids is ultimately misguided. What an agency must have is a reasonable *expectation* that it will receive two or more offers from responsive small business concerns. 48 C.F.R. § 19.502.2. *See Genisco Tech. Corp. v. Stone*, 793 F. Supp. 357, 358–59 (D.C. Cir. 1992). The actual merits of the individual bids are not dispositive on the issue of the reasonableness of the contracting officer's expectations.

The Court therefore finds no basis in the administrative record to find that the contracting officer acted arbitrarily or capriciously when issuing the Solicitation. As stated, the record demonstrates that the contracting officer had multiple reasons for her decision to issue the Solicitation as a small business set-aside. First, the procurement history shows that the expectation of at least two responsive small business bidders was reasonable. Second, the contracting officer conducted sufficient market research and acquisition planning before issuing the Solicitation as a small business set-aside. Additionally, there was nothing in the record to indicate the attempts were made arbitrarily or capriciously. The decision to set-aside the Solicitation for small business follows the standard set forth in FAR part 19, the regulation provision that governs small business set-asides in procurements such as the one subject to this challenge. 48 C.F.R. §19.502-2(b). For these reasons, the Court finds HRSA's decision to make the Solicitation a small business set-aside to be rational. Accordingly, McKing fails to meet its burden of showing that HRSA had no rational basis for its decision.

Turning next to McKing's accusation that HRSA intentionally framed the procurement attempts in order to exclude McKing from winning the follow-up contract, the Court finds nothing in the administrative record to support such an accusation. To be sure, "the presumption that government officials act in good faith is nothing new." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). "Showing that a government official acted in bad faith is intended to be very difficult, and something stronger than a 'preponderance of the evidence' is necessary to overcome the presumption that he acted in good faith." *See id*. (discussing which standard, either "clear evidence to the contrary" or "well-nigh irrefragable," is the proper standard of evidence required to overcome the presumption that a government official acts in good faith). While McKing asserts in their pleadings that the only logical conclusion for having three separate procurements attempts is a conspiracy by the contracting officer to exclude McKing from the follow-up contract, no evidence in the record even begins to provide a basis for such accusations. To the contrary, the administrative record demonstrates that the contracting officer initially believed McKing was eligible to compete for the follow-up contract because McKing was still listed as a small business concern on the GSA's schedule when the contracting officer conducted her initial research. AR 621. Without any evidence supporting its position, certainly then, McKing's animus argument fails. The

[19] As alluded to in the fact section, this allegation of improperly obtained consultant bid information is also the basis of McKing's PIA claim addressed below.

Court finds no evidence that HRSA or the contracting officer acted in bad faith when HRSA issued the Solicitation as a small business set-aside.

Finally, McKing's Procurement Integrity Act claim is likewise without merit. The PIA forbids a government procurement official from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a)(1). As with their other allegations, to prevail McKing must show a "clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333. This McKing has not done.

Turning to the substance of McKing's PIA allegations, here, McKing specifically alleges HRSA intentionally disclosed its proprietary list of dental consultants to Rivera, and assisted Rivera with their bid. This is the "conspiracy" contention discussed above. According to McKing, HRSA disclosed to Rivera the names, contact information and pay rates of the dental consultants McKing used in its contract. McKing makes this allegation based on certain e-mails in the administrative record from Rivera to HRSA officials. AR 909, 1081-85. McKing also alleges that HRSA deliberately provided Rivera with enough information to guarantee that Rivera could successfully bid on the Solicitation, thereby keeping McKing from winning the solicitation. However, McKing's PIA allegations are without merit for two primary reasons—first, the materials McKing alleges HRSA improperly disclosed are not subject to PIA protection, and second, the record demonstrates that HRSA did not improperly disclose any information to any bidder nor did they improperly reach out any bidders to help them create a successful bid.

The purpose of the Procurement Integrity Act is to prevent improper competitive practices in government procurement.[20] The PIA imposes four main categories of restrictions: 1) disclosure of procurement information; 2) obtaining of procurement information; 3) actions required when procurement officers are contacted by offerors regarding nonfederal employment; and 4) former officials' acceptance of compensation from a contractor.[21] Relevant here is the first type of restriction—disclosure of procurement information.

McKing's PIA allegations fail because the information that HRSA allegedly disclosed is not subject to PIA protection. Under the PIA, "contractor bid or proposal information" is defined as "information submitted to a Federal agency as part of or in connection with a bid or proposal. . . . *if that information has not been previously made available to the public or disclosed publically*." 41 U.S.C. § 423(f)(1) (emphasis added). But the uncontroverted evidence in the record shows that the

---

[20] *See generally* Elizabeth Dietrich, *The Potential for Criminal Liability in Government Contracting: A Closer Look at the Procurement Integrity Act*, 34 PUB. CONT. L. J. 521 (2005).

[21] *Id.*

allegedly proprietary material was actually publicly available on a Georgetown University website as early as February 2005. AR 2454-62. Obviously then, if it was publicly available on a website, the consultant information McKing claims as proprietary is explicitly excluded from PIA protection. Furthermore, and this is critical to the analysis, whether or not this information was publicly available, the record shows that the consultant list was not obtained and posted improperly—the dental consultants provided their own contact information to Georgetown University (and were well aware that their information was being posted online). *Id*. As such, the consultant list does not meet the PIA definition of "contractor bid or proposal information" and therefore is not subject to PIA protection.[22]

Further, even assuming *arguendo* that McKing's consultant list was proprietary, the evidence in the record demonstrates that Rivera's bid information that identified the dental consultants (the source of its pricing information) was derived from Rivera's contacting those dental consultants, not from any information supplied to it from the agency. AR 1534. Since the record indicates that Rivera contacted the dental consultants and obtained this information on its own, and, as discussed above, there is no credible evidence in the record suggesting bad faith or wrongdoing by HRSA, McKing's allegation that HRSA improperly disclosed McKing's proprietary consultant list must fail.[23]

But there is an even more fundamental fact that torpedoes McKing's ship: McKing's dental consultant list cannot even be considered proprietary. Evidence in the record clearly shows that McKing did not develop the list. Indeed, its genesis was in 2003 when HRSA awarded Health Systems Research, Inc. ("HSR") a task order to coordinate Head Start Program-related oral health activities, which included recruitment and selection of dental consultants. AR 2130-40. It was then

---

[22] McKing's argument is further predicated on the assertion that the consultant list constituted "source selection information" and cites to the PIA, 41 U.S.C. § 423(f)(2), to define source selection information to "include 'technical evaluation plans.'" Pl.'s Reply to Def.'s Cross-Mot. for Jdgmt at 13. However, the definition of "source selection information" that McKing cites is incomplete. The statute provides that source selection information is "information prepared for the use by a Federal agency for the purpose of evaluating a bid or proposal to enter into a Federal agency procurement contract, *if that information has not been previously made available to the public or disclosed publicly*." 41 U.S.C. § 423(f)(2) (emphasis added). But, as just noted, the consultant information had been posted on the internet since February 2005, and, therefore, does not meet the source selection definition for the procurement.

[23] While the Court here focuses on one element of the definition of "contractor bid or proposal information" to determine the validity of McKing's PIA claim, other FAR requirements, sink McKing's claim. For instance, under FAR § 3.104-1.3, the Improper Business Practices Safeguard Section, any proprietary information must be clearly marked as proprietary to be afforded proprietary protection. 48 C.F.R. § 3.104-1.3. Similarly, a contractor is required to mark information it seeks to protect as "contractor bid or proposal information" in order for it to be protected. 48 C.F.R. §3.104-1.4. McKing failed to do either.

that HSR assisted HRSA in identifying the list of dental consultants that McKing alleges is its proprietary property. AR 2143-2277. While McKing did later help with the subsequent development of the list of dental consultants, the brief history of the development of the list, as demonstrated by the record, belies McKing's claim that the list solely belongs to them. The Court very much doubts that a list of dental professionals—after all the identity and addresses of individual professionals are generally publically available—can constitute proprietary information. But the point is not that, but that McKing has utterly failed to demonstrate what in the record made its alleged list proprietary.

Turning briefly to the allegedly improper communications between Rivera and HRSA, the Court finds that none of their e-mails, nor any other evidence in the record for that matter, concretely shows that HRSA improperly provided Rivera with proprietary consultant lists, price lists or any other potentially useful bid information that would amount to a PIA violation (or arbitrary and capricious behavior violating CICA). For instance, the December 17, 2006 e-mail from Rivera, see AR 909, is completely void of any evidence of any impropriety. Nevertheless, there are other communications that might possibly be construed to raise an inference of an improper help. For instance, there is mention in the record of a telephone call where Contract Specialist Coger responded to Mr. Rivera with the assertion that it maybe necessary to "explain how this is coming out." AR 1083. However, what "this" meant in context here is unclear, rendering the entire phrase vague at best.

Other e-mails show that Rivera continued to submit questions to the agency on December 19, 2007, and January 5, 2007. Mr. Rivera's January 5, 2007 e-mail informed the HRSA that "[m]any of my questions have been answered," although it was not explained what this meant or how he obtained such answers. AR 1081. To be sure, there is no evidence in the record that either Contract Officer Garcia or Contract Specialist Coger had any communication, oral or written, with Rivera or any other representative of his company in direct response to the December 19, 2006 and January 5, 2007 e-mails. In fact, the only agency response to Rivera's questions in the record was in the first amendment to the Solicitation. AR 1070-75, 2600-05. And this January 12, 2007 amendment, publically available in *FedBizOpps*, was designed in part "to answer questions posed by vendors." AR 954, 2600.

It is apparent that nothing in the e-mail specified what questions Rivera asked, whether the answering of these questions would have been impermissible under the law or unethical, or whether the answers would have materially helped Rivera obtain the bid. And even more fundamentally, there is no evidence that the contract officer, the contract specialist, or any other HRSA representative actually provided Rivera with answers to questions. The e-mails, individually and taken collectively, are at best ambiguous. Indeed, one can reasonably infer, for instance, that the reason certain concerns or questions that Rivera had were no longer issues was because Rivera himself resolved his own problems or had his questions concerning the procurement answered by various dental consultants of which he had been in contact with. See AR 1534, 1555, 1562, 1574, 1597, 1617, 1630, 1662, 1667, 1675, 1683, 1699, 1714, and 1739. Consequently, McKing has not presented sufficient evidence in the record that the e-mail correspondence establishes bad faith, *Am-Pro*, 281 F.3d at 1243 (requiring clear and convincing evidence to establish agency bad faith), nor met its burden that such

correspondence constituted a violation of the law, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (requiring a showing of illegality by a preponderance of the evidence).

**CONCLUSION**

For the forgoing reasons, defendant's cross-motion for judgment on the administrative record is **GRANTED** and plaintiff's motion for judgment on the administrative record is **DENIED**. Failing to demonstrate any possibility of success on the merits, plaintiff's petition for injunctive relief is likewise **DENIED**. *See Blue & Gold Fleet, L.P. v. U.S.*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (opining that "the most important factor required to enjoin the award of the contract [is] success on the merits"). The Clerk of the Court is directed to enter judgment in favor the United States.

**IT IS SO ORDERED.**

s/ Lawrence J. Block

**Lawrence J. Block**
**Judge**